UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARITZA PRINCE, individually and on behalf of all persons similarly situated,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br><br>　　　　-against-<br><br><br>JASON D. BOROFF & ASSOCIATES, PLLC; BOSTON TREMONT HOUSING DEVELOPMENT FUND CORPORATION; PHIPPS HOUSES SERVICES, INC.; PROCESS SERVER PLUS, INC.; ENRIQUE DIAZ; and EMMANUEL LANZOT,<br><br>　　　　　　　　　　　　　Defendants. | **No. 24 Civ. 2706**<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

1.　　Plaintiff Maritza Prince brings this action on behalf of herself and hundreds of other low-income tenants in the Bronx to challenge Defendants' practice of bringing unlawful eviction lawsuits designed to displace them from their affordable apartments and wrongfully extract from them many thousands of dollars they do not owe.

2.　　The Lambert Houses is a sprawling housing development in the Bronx where tenants' rents are paid through "Section 8" subsidies—federal housing assistance designed to provide security and stability to those who cannot otherwise afford housing. Defendant Boston Tremont Housing Development Fund Corporation ("Boston Tremont"), the landlord and owner of the Lambert Houses, is a nonprofit affordable housing provider entrusted by the federal government to administer this development for the good of these residents. Instead of doing so, however, Boston Tremont and its for-profit management company, Phipps Houses Services, Inc. ("Phipps"), have engaged in a course of conduct that has had the effect of denying these

1

residents the rent subsidies to which they are entitled, pushing them out of their apartments, and seeking to collect through improper litigation exorbitant sums in market-rate rents those tenants do not owe.

3.     Specifically, Boston Tremont and Phipps—despite explicit obligations placed on them by the federal government to assist and guide tenants in annually recertifying for their Section 8 subsidies—fail to do so in numerous ways. For example, they do not offer tenants the recertification interviews they are guaranteed by law and do not provide tenants information and documents in their native languages, even though many Lambert Houses residents are Spanish speakers.

4.     After tenants foreseeably lose their subsidies, Boston Tremont and Phipps hire Defendant Jason D. Boroff & Associates, PLLC (the "Boroff Firm") to sue these tenants for eviction. These lawsuits are illegal in multiple ways, but most critically, they wrongfully claim that the tenants owe excessive back rent at "market" (non-subsidized) rates—even though seeking those rents is prohibited by federal law, administrative guidance, and the tenants' own leases. The lawsuits also fail to credit payments tenants actually made and make other misstatements.

5.     After preparing these improper lawsuits, the Boroff Firm, in turn, hires Process Server Plus, Inc. ("Process Server Plus") and two of its individual process servers, Enrique Diaz and Emmanuel Lanzot, to effectuate service of process. But rather than lawfully notify residents of the suits, these process servers systematically lie, implausibly asserting that virtually every time they went to a tenant's apartment to serve process, there was simply nobody home. As a result, tenants are deprived proper notice of the lawsuits.

6.      Ms. Prince is a seventy-four year old Lambert Houses resident whose life has been upended by these practices. She has lived in the same apartment, receiving a Section 8 subsidy to pay her rent, for more than thirty years. But Defendants thwarted her attempts to recertify, charged her a market rent of $2,700 per month which she did not owe and could not afford, and then sued her in housing court to evict her and her family. In the eviction lawsuit they filed against her, Defendants failed to credit any of her rent payments, which she diligently made each month at her subsidized rate; failed to lawfully serve her with process; filed a false affidavit of service; and proceeded to litigate against her. If successful, that suit would extract from Ms. Prince more than *$36,000* in market rate rent she does not owe and evict her and her family from their home of decades.

7.      Ms. Prince is not alone. She and hundreds of her neighbors in the Lambert Houses and similar housing developments in the Bronx have been systemically harmed by the actions of one or more of these Defendants. These individuals are overwhelmingly Black and Latinx, and they disproportionately struggle to meet their daily expenses, making them more easily victimized by Defendants' conduct. Amidst New York City's affordable housing crisis, the inevitable consequence of Defendants' actions, if they continue, is to push these tenants into the City's overburdened shelter system, derailing their lives in the process.

8.      Meanwhile, Defendants enrich themselves at the expense of these tenants. The money extracted from Class Members' pockets go straight to Boston Tremont's and Phipps' annual revenues—revenues that support Boston Tremont's President/CEO receiving a salary of over $1 million per year. And Boroff, Process Server Plus, Diaz, and Lanzot all get paid for the work they do at Boston Tremont's behest, indirectly profiting from these efforts to displace and impoverish tenants who are already struggling.

3

9.      Defendants' practices violate the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* (the FDCPA), which prohibits unfair, deceptive, and abusive debt collection practices; New York General Business Law § 349, which prohibits "deceptive acts or practices in the conduct of any business, trade or commerce"; and N.Y.C. Admin. Code § 20-409.2, which provides a cause of action for "[a]ny person injured by the failure of a process server to act in accordance with the laws and rules governing service of process in New York state"; and constitutes common law negligence and breach of contract. Ms. Prince seeks redress for these violations on behalf of herself and her neighbors.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d), and supplemental jurisdiction over the state and city law claims pursuant to 28 U.S.C. § 1367(a).  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201(a) and 2202.

11.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because it is the district where defendants Boston Tremont, Phipps, and the Boroff Firm reside, and it is the district in which a substantial part of the events giving rise to Plaintiff's claims occurred, as it is the district in which Defendants filed and litigated actions against Plaintiff and Class Members.

## PARTIES

12.     Plaintiff Maritza Prince is a natural person residing in the Lambert Houses in the Bronx, New York.

13.     Plaintiff is a "consumer" as that term is defined by the FDCPA, 15 U.S.C. § 1692a(3), in that Plaintiff was alleged to owe a debt stemming from residential rent. *Romea v.*

*Heiberger & Assocs.*, 163 F.3d 111, 116 (2d Cir. 1998) ("[U]nder the FDCPA, back rent is debt.").

14.     Defendant Boston Tremont Housing Development Fund Corporation ("Boston Tremont") is a not-for-profit corporation organized under Article XI of New York State's Private Housing Finance Law with its principal place of business located at 902 Broadway, 13th Floor, New York, New York 10010. Boston Tremont is listed as the non-profit owner of the Lambert Houses with the United States Department of Housing and Urban Development ("HUD"), with Owner Participant ID # 364223.

15.     Defendant Phipps Houses Services, Inc. ("Phipps") is a for-profit corporation organized under the laws of the State of New York with its principal place of business located at 902 Broadway, 13th Floor, New York, New York 10010. Phipps is listed as the "profit-motivated" management company of the Lambert Houses with HUD, with Management Agent Participant ID # 830.

16.     On information and belief, at all times described herein, Phipps acted on behalf of Boston Tremont.

17.     On information and belief, at all times described herein, Phipps and Boston Tremont act essentially as a single entity and as alter egos of each other and Phipps exercises control and dominion over the activities of Boston Tremont. Specifically:

   a. Boston Tremont and Phipps share the same office address.
   b. Boston Tremont holds out its address as "Boston Tremont Housing Development Fund Corp. c/o Phipps Houses Services Inc."
   c. Official HUD contacts for Boston Tremont list the Phipps main phone numbers as the Boston Tremont phone number.
   d. Official HUD contacts for Boston Tremont list the "@phippsny.org" email address for Phipps's President/CEO as the Boston Tremont email address.
   e. Phipps's President/CEO is listed on a publicly-available copy of Boston Tremont's IRS form 990 as the principal officer of Boston Tremont.

      f.   Phipps is listed on a publicly-available copy of Boston Tremont's IRS form 990 as a related organization to Boston Tremont.

18.     Defendant Jason D. Boroff & Associates, PLLC (the "Boroff Firm") is a domestic professional service limited liability company organized under the laws of the State of New York with its principal place of business located at 349 East 149th Street, Suite 703, Bronx, New York 10451.

19.     Defendant Process Server Plus, Inc. ("Process Server Plus") is a corporation organized under the laws of the State of New York with its principal place of business located at 96-11 101st Avenue, Suite 2, Ozone Park, New York 11416. Process Server Plus is registered as a process serving agency with the New York City Department of Consumer and Worker Protection ("DCWP," formerly known as the New York City Department of Consumer Affairs), with license number 1077004-DCA.

20.     Defendant Enrique Diaz ("Diaz") is a natural person. He is registered as an individual process server with DCWP, with license number 2017524-DCA. Diaz serves process for Process Server Plus.

21.     On information and belief, at all times described herein, Diaz was an employee or independent contractor of Process Server Plus and acted on behalf of Process Server Plus.

22.     Defendant Emmanuel Lanzot ("Lanzot") is a natural person. He was previously registered as an individual process server with DCWP, with license number 1258345-DCA. Lanzot serves process for Process Server Plus.

23.     On information and belief, at all times described herein, Lanzot was an employee or independent contractor of Process Server Plus and acted on behalf of Process Server Plus.

24.     Defendants the Boroff Firm, Process Server Plus, Diaz, and Lanzot are all "debt collectors" as defined by the FDCPA, 15 U.S.C. § 1692a(6), in that Defendants regularly use the

instrumentalities of interstate commerce or the mails in their businesses, the principal purpose of which is the collection of debts, and Defendants regularly collect consumer debts due or owed to another.

25.     Although the FDCPA's definition of "debt collector" exempts process servers "while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt," 15 U.S.C. § 1692a(6)(D), this exemption does not apply to any process server who *fails* to serve process. *See, e.g.*, *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 423 (S.D.N.Y. 2010).

## STATUTORY AND REGULATORY BACKGROUND

***Landlords Must Follow the Tenant Protections Mandated by Federal Subsidized Housing Law***

26.     Project Based Rental Assistance ("PBRA") is a type of affordable publicly-subsidized housing administered by the Department of Housing and Urban Development ("HUD"). In PBRA developments, HUD contracts directly with private landlords to provide affordable housing to low-income tenants eligible for subsidies within the owner's development. 42 U.S.C. § 1437f(o)(13).

27.     PBRA tenants and landlords must sign a lease with terms provided by HUD. *See* Form HUD-90105 ("HUD Model Lease").

28.     Tenants residing in PBRA developments must meet all eligibility requirements for subsidized rent, including that they must have incomes below certain guidelines. 42 U.S.C. § 1437a(a)(1); 24 C.F.R. § 5.653.

29.     PBRA tenants pay approximately 30% of their monthly family income towards their rent. 24 C.F.R. §§ 5.628, 5.634. HUD pays the balance.

30.    PBRA landlords must reexamine tenants' income and household composition on an annual basis. 24 C.F.R. § 5.657(b). This process is known as "recertification" and occurs on the tenant's recertification anniversary. Upon recertification, the landlord re-computes the tenant's portion of the rent and verifies the tenant's continued eligibility for subsidized housing.

31.    To recertify, PBRA tenants must submit information and documentation requested by the landlord and attend an annual interview scheduled and conducted by the landlord. 24 C.F.R. § 5.657(b)(2); *see* A Guide to Interviewing for Owners of HUD-Subsidized Multifamily Housing Projects, *available at* https://www.hud.gov/sites/documents/DOC_20483.PDF.

32.    HUD imposes certain responsibilities on PBRA landlords to ensure they effectively facilitate tenants' submission of recertification-related information and documentation. These are outlined in the HUD Multifamily Occupancy Handbook 4350.3 REV-1 ("HUD Handbook"), *available at* https://www.hud.gov/sites/documents/43503HSGH.PDF. .

33.    It is the *landlord's* responsibility to ensure the annual recertification interview is scheduled by telling tenants the location, days, and office hours that its staff will be available for a recertification interview and identify the staff person responsible for scheduling, and to hold the annual recertification interview with each tenant.

34.    It is the *landlord's* responsibility to send at least one reminder notice to each tenant prior to the tenant's recertification anniversary.

35.    It is the *landlord's* responsibility to send a second reminder notice, if the tenant fails to respond to the first notice, followed by a third reminder notice if the tenant fails to respond to the first two notices. HUD Handbook 7-13. (Collectively, the first, second, and third reminder notices are "Reminder Notices").

36.    Each Reminder Notice must include specific information, including, for example, "the name of the staff person at the property to contact about scheduling a recertification interview, the contact information for this person, and how the contact should be made"; "the location, days, and office hours that property staff will be available for recertification interviews"; "the information that the tenant should bring to the interview"; "the cutoff date by which the tenant must contact the owner and provide the information and signatures necessary for the owner to process the recertification"; and the consequences of "the tenant fail[ing] to respond before the recertification anniversary date." The Third Reminder Notice must additionally "[s]pecify the amount of rent the tenant will be required to pay if the tenant fails to provide the required recertification information by the recertification anniversary date."  HUD Handbook 7-12, 7-13.

37.    It is the *landlord's* responsibility to timely process tenants' annual recertifications. HUD Handbook 7-8.

38.    If a tenant does not provide the documentation and information requested by the landlord, it is the *landlord's* responsibility to consider whether there are "extenuating circumstances" affecting the tenant, including "circumstances beyond the tenant's control." HUD Handbook 7-20.

39.    It is the *landlord's* responsibility to provide individuals with limited English proficiency meaningful access to the recertification process, "includ[ing] interpreter services and/or written materials translated into other languages." HUD Handbook 2-9. *See also id.* 6-4, 7-9, App'x 6-C; Executive Order 13166; Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 72 Fed. Reg. 2,732.

40.    If a tenant's recertification is not timely processed due to the *landlord's* delays, such as when the landlord "fails to provide timely recertification reminder notices per HUD requirements" or otherwise fails to timely complete the recertification procedures, the landlord cannot increase the tenant's rent until the landlord has completed the recertification. HUD Handbook 7-16.

41.    The only circumstance in which a landlord may increase a tenant's rent for failure to timely recertify is when the *landlord* has complied with all HUD procedures.

42.    If, and only if, the landlord has complied with all HUD procedures, but the tenant's recertification is not timely processed due to the *tenant's* delays in providing required documentation and information or failure to report for a scheduled recertification interview, the landlord may increase the tenant's rent—including up to market rent—on the annual recertification date. HUD Handbook 7-16, 7-18, 7-19.

43.    Under the tenants' leases, the landlord can *only* make "changes in the Tenant's rent or tenant assistance payment," including "[r]equir[ing] the Tenant to pay the higher, HUD-approved market rent for the unit," when the landlord has acted "in accordance with the time frames and administrative procedures set forth in HUD's handbooks, instructions and regulations related to administration of multifamily subsidy programs." HUD Model Lease ¶ 4; HUD Model Lease ¶ 15.

44.    Landlords can commence eviction proceedings "only as a last measure for enforcing compliance. Prior to any eviction proceedings, owners must make every effort to contact the disabled and frail elderly to be sure the requirements of the recertification process are communicated in a manner that is comprehended by the tenant." HUD Handbook 7-14. "If a tenant fails to report for the recertification interview and fails to pay market rent, or make

arrangements to pay, the owner is obligated to evict for nonpayment." HUD Handbook 7-18, 7-19.

45.    During the COVID-19 pandemic, HUD did not generally ease any recertification obligations placed *on landlords*. HUD issued guidance directing that landlords were still required to complete tenant annual recertifications. HUD did not suspend its requirement that recertification interviews be held in person.

46.    During the COVID-19 pandemic, HUD eased the recertification obligations placed *on tenants* by, among other things, directing landlords to consider a tenant's "extenuating circumstances," such as illness, if a tenant was unable to attend recertification interviews or sign required HUD forms. Even if an "extenuating circumstance" existed, it was the *landlord's* responsibility to comply with the requirements by beginning the recertification process within 90 days of learning of the extenuating circumstance.

***Landlords, Law Firms, and Process Servers Must Follow the Laws Governing Evictions and Service of Process***

47.    The New York Real Property Actions and Proceedings Law and Real Property Law govern requirements for eviction lawsuits in New York State.

48.    Before commencing an eviction lawsuit, a landlord must serve a notice ("Predicate Notice") that informs the tenant that the landlord will commence an eviction lawsuit unless certain steps are taken within a particular time period.[1]

---

[1] The Predicate Notice that must be served depends on the nature of the eviction proceeding. In an eviction based on non-payment of rent, a landlord must serve "a written demand of the rent" on the tenant "with at least fourteen days' notice requiring, in the alternative, the payment of the rent, or the possession of the premises." N.Y. R.P.A.P.L. § 711(2). The Federal CARES Act extends the time period from fourteen to thirty days. 15 U.S.C. § 9058(c)(1). In an eviction based on termination of a lease at the end of the lease term, a landlord must serve written notice stating that it wishes to terminate the tenancy, with thirty, sixty, or ninety days' notice to the tenant, depending on the length of the tenant's lease and occupancy of the apartment. N.Y. R.P.L. §§ 226-c, 232-a.

49.     After the Predicate Notice has been lawfully served and the time period provided by the Predicate Notice has expired, the landlord must serve an eviction petition ("Eviction Petition") on the tenant before commencing an eviction proceeding. N.Y. R.P.A.P.L. § 735.

50.     To commence an eviction proceeding, the landlord must file the Eviction Petition, a copy of the Predicate Notice, an Affidavit of Service attesting to service of the Eviction Petition, and an Affidavit of Service attesting to service of the Predicate Notice with the Housing Court within three days of service of the Eviction Petition. N.Y. R.P.A.P.L. § 735(2).

51.     In addition to seeking a judgment for possession of the apartment, Eviction Petitions often seek a money judgment for rent due. N.Y. R.P.A.P.L. § 741(5).

52.     If a tenant fails to appear or submit an answer, the landlord may file an application for a default judgment. N.Y. C.P.L.R. § 3215(a).

53.     Landlords who obtain judgments against tenants may execute on them by obtaining warrants of eviction. N.Y.R.P.A.P.L. § 749(1), (3).

54.     Landlords who obtain money judgments against tenants may execute on them by garnishing the tenants' wages or levying their bank accounts, with no judicial approval required, for at least the next *twenty years*. N.Y. C.P.L.R. §§ 211(b), 5231, 5232.

55.     Predicate Notices and Eviction Petitions must be served on tenants through one of three lawful methods: (1) personal service; (2) substitute service; or (3) conspicuous service. N.Y. R.P.A.P.L. §§ 711(2), 713, 735(1)(a); N.Y. R.P.L. § 232-a.

56.     Personal service means personal delivery of the Predicate Notice or Eviction Petition directly to the tenant. N.Y. R.P.A.P.L. § 735(1)(a).

57.     Substitute service means personal delivery of the Predicate Notice or Eviction Petition to a person of suitable age and discretion who resides in the subject apartment. N.Y.

R.P.A.P.L. § 735(1). Within one day, the Predicate Notice or Eviction Petition must also be mailed to the tenant both by registered or certified mail and by regular first class mail. *Id.*

58.    Conspicuous service means "affixing a copy . . . upon a conspicuous part of the property sought to be recovered or placing a copy under the entrance door of such premises." Within one day, the Predicate Notice or Eviction Petition must also be mailed to the tenant both by registered or certified mail and by regular first class mail. N.Y. R.P.A.P.L. § 735(1).

59.    Conspicuous service is legally permitted only "if upon reasonable application" by the process server, admittance to the subject apartment "cannot be obtained" and a person to deliver the papers via personal or substitute service cannot be "found." N.Y. R.P.A.P.L. § 735(1). "Reasonable application" means that a process server must make at least two attempts at personal or substitute service that have at least a reasonable expectation of success.

60.    A New York court lacks personal jurisdiction over any individual who was not lawfully served with process, and such an individual may move to dismiss an action, or vacate a judgment, on this basis. *See* N.Y. C.P.L.R. §§ 3211(a)(8), 5015(a)(4).

61.    An individual's actual knowledge of a lawsuit does not obviate the requirement that service of process be made in accordance with the statutory requirements.

62.    All New York City process servers and process serving agencies must be licensed by DCWP and must follow rules and regulations issued by the City. N.Y.C. Admin. Code § 20-403 *et seq.*

63.    All New York City process serving agencies must "be legally responsible for any failure to act in accordance with the laws and rules governing service of process by each process server to whom it has distributed, assigned or delivered process for service." N.Y.C. Admin. Code § 20-406.2(b).

## FACTUAL ALLEGATIONS

**A. Boston Tremont and Phipps Are Charged With Operating the Lambert Houses to Benefit Low-Income Residents**

64.     The Lambert Houses is a large subsidized housing development in the West Farms section of the Bronx, New York.

65.     West Farms is a small neighborhood in the Bronx that is home to many Central and South American immigrants and small business owners. These residents have a reputation of working actively to improve their community in the face of decades of disinvestment and high levels of poverty.[2]

66.     The census tract encompassing the Lambert Houses is approximately 69% Hispanic or Latinx and 27% Black or African American, significantly higher than the rest of New York City (29% and 23%, respectively). Fewer than 1% of the residents are White, non-Hispanic. Over half of the residents speak Spanish and 20% are over 60 years old. The median income is less than $25,000.

67.     Boston Tremont has contracted with HUD to provide subsidized housing at the Lambert Houses to Bronx residents through the PBRA program since at least 1987. HUD and Boston Tremont recently renewed the Lambert Houses PBRA contract for 20 years, spanning 2019 to 2039. The Lambert Houses is listed with HUD as Property ID #800243242.

68.     The Lambert Houses comprises approximately 730 units of subsidized housing in over a dozen buildings. The market rents for most of these units range from approximately $1,550 per month for a studio to $2,750 per month for a four-bedroom apartment.

---

[2] *See* Carl Boisrond, *West Farms 10460: A Bronx Neighborhood Reeling from the Pandemic and a History of Disinvestment*, Gothamist, (Feb. 18, 2021), https://gothamist.com/news/west-farms-10460-bronx-neighborhood-reeling-pandemic-and-history-disinvestment.

69.     The Lambert Houses buildings were originally built in the 1970s on a massive 12-acre site. The Lambert Houses were located in a community that faced "white flight" and disinvestment, and the development was considered an innovative stabilizing force for the community. The development consisted of three residential "superblocks" of multiple interconnected buildings with maze-like structures. Since then, the buildings have deteriorated, experiencing significant structural damage. It has also been reported that the layout is conducive to crime.[3]

70.     Phipps and Boston Tremont are part of the "Phipps Houses Group," which has annual revenue of nearly $100 million and assets of nearly $1 billion. Phipps and Boston Tremont share a President/CEO, who earns a salary of approximately $1 million per year.

71.     The Lambert Houses is in the midst of a fifteen year, $600 million redevelopment, which involves demolishing all fourteen original buildings and replacing them with taller towers containing more than twice as many apartments. The redevelopment is led by Phipps and financed by the New York City Department of Housing Preservation and Development and Housing Development Corporation, as well as private financing. One building has already been demolished and replaced by a newly-constructed building that opened in 2019, and a second is under construction. As part of the regulatory agreement underlying the redevelopment plan, the Lambert Houses receives a property tax exemption through 2035 that is, on information and belief, worth millions of dollars per year.

---

[3] *See generally* Sebastian Morris, *Phipps Houses Receives $188M Financial Package To Continue Construction At Lambert Houses In The Bronx*, YIMBY, (Jan. 11, 2022 7:00AM), https://newyorkyimby.com/2022/01/phipps-houses-receives-188m-financial-package-to-continue-construction-at-lambert-houses-in-the-bronx.html; Stephen Daly, *The Project That Transformed A Bronx Neighborhood*, New York Times, (May 15, 1983), https://www.nytimes.com/1983/05/15/realestate/the-project-that-transformed-a-bronx-neighborhood.html; James Barron, *Rebirth of Bronx Housing Complex Aims to Cut Crime and Increase Homes*, New York Times, (Oct. 27, 2016), https://www.nytimes.com/2016/10/28/nyregion/bronx-housing-project-lambert-houses.html.

72.     All current Lambert Houses tenants whose buildings have been or will be demolished in the redevelopment should be guaranteed an apartment in the newly-constructed buildings, according to the regulatory agreement. As part of the regulatory agreement, Boston Tremont agreed that no residents of the Lambert houses "may be evicted nor [their] tenancy terminated except for good cause."

73.     However, the redeveloped Lambert Houses will not be financially accessible for many current tenants. For example, a recent lottery for apartments in one of the redeveloped buildings accepted applications only from prospective tenants with incomes over 60% of the median income for the New York City metro area, which would have the effect of excluding not only current tenants, who all have lower incomes, but also most families in the Bronx.

74.     As part of its participation in PBRA, the Lambert Houses is required to have a biennial management review.

75.     In the latest review for which information is publicly available, conducted in July 2021, the Lambert Houses was rated as "unsatisfactory" in the "Leasing and Occupancy" category based on review of example tenant files. The review found, among other issues:

- many types of missing information in tenant files, including annual unit inspections, Violence Against Women Act notices, lead paint inspections, social security card verifications, and tenant signatures on key documents;

- that Boston Tremont "miscalculated annual income, medical expenses, elderly allowance . . . [and] dependent allowance" and that "[t]enants should not be charged retroactively due to management's error";

- "reminder notices discrepancies," including that for multiple units, all three Reminder Notices were missing, so that "[t]he cited tenants may not have been properly made aware of the need to complete the recertification or the requirements to do so and they may not have been recertified and/or recertified late";

- problems with initial reminder notices, stating, "Initial notice is missing. . . . This is a repeat finding. . . . Management failed to issue initial annual recertification notice. . . . [T]he cited tenants may not have been properly made aware of the need to complete the

recertification or the requirements to do so and they may have not been recertified and/or recertified late"; and

- lease addendums that were not approved by HUD, discrepancies between the security deposit ledgers and lease terms.

**B. Boston Tremont and Phipps Fail to Offer Lambert Houses Tenants A Reasonable Opportunity to Complete their Annual Recertifications, Then Unlawfully Charge Them Market Rent**

76.    Boston Tremont is responsible for complying with HUD-mandated annual recertification procedures both as a matter of federal law and under the terms of the last operative leases entered into by Boston Tremont and its tenants (the "Leases"), which are identical to the HUD Model Lease. *See supra* ¶¶ 27, 43.

77.    On information and belief, Boston Tremont delegates to Phipps responsibility for the annual recertification process.

78.    Boston Tremont and Phipps consistently and materially fail to comply with many of the annual recertification procedures HUD requires.

79.    Boston Tremont and Phipps regularly fail to hold recertification interviews for Lambert Houses tenants. Instead, Boston Tremont and Phipps require tenants to submit all documentation and information by regular mail or depositing them in an unmonitored lockbox on site.

80.    Boston Tremont and Phipps fail to regularly send the First, Second, and Third Reminder Notices required by HUD and/or send these Notices without content required by HUD. *Supra* ¶ 36.

81.    Boston Tremont and Phipps fail to regularly translate necessary information into Spanish, even though they are required by HUD to do so since many Lambert Houses residents are, like Ms. Prince, Spanish speakers with limited English proficiency.

82.     As a result of these failures, many tenants do not timely complete their recertifications. This is true notwithstanding that many Lambert Houses tenants, like Ms. Prince, make extraordinary efforts to recertify, submitting dozens of documents and making numerous efforts to contact Boston Tremont and/or Phipps.

83.     Because Boston Tremont and Phipps fail to regularly follow the recertification procedures required by HUD, they are not lawfully permitted to charge market rent under the tenants' Leases and HUD regulations, and Boston Tremont is in breach of the Leases.

84.     Nonetheless, Boston Tremont and Phipps charge tenants market rent, on the purported ground that the failure to timely recertify was due to the tenants' conduct.

85.     On March 14, 2024, Evonne Capers, the Chair of Bronx Community Board 6, sent a letter to the President/CEO of Phipps, copying HUD, requesting that Phipps address Lambert Houses tenants' "concerns about the existing Lambert buildings and management practices," and that HUD conduct an emergency audit of Phipps's management practices. The letter noted the following complaints, among others:

- "[T]here is no face-to-face interaction with management office staff. Tenants are directed to call a phone number and speak to someone. The management office voicemail is full."

- "[T]he management office is not providing translation services for tenants who do not speak English" and "[T]he management office is sending documents, including recertification, in English, to tenants who have asserted to the management office that they do not speak English. Tenants report explaining to management office staff that they do not speak English, and then being directed to sign documents they do not understand, or risk losing their apartments."

- "Tenants report submitting their lease recertifications into the designated location . . ., and management not processing leases for months on end. Tenants report then receiving calls months later about errors on recertifications, without any offer to help troubleshoot the recertification process from staff."

- "Tenants allege chronic rent overcharge – management (allegedly) regularly adds arrears to tenant accounts that are not owed, often in thousands of dollars. Tenants report miscalculations in income that also lead to overcharge."

- "Tenants allege being sued in housing court for arrears they do not owe."

- "[B]ecause management takes so long to process leases, management charges tenants the market rate rent for 'failure' to renew their lease."

- "Tenants report a lack of information on their guaranteed right to move into the new Lambert buildings."

**C. The Boroff Firm Files False and Misleading Eviction Lawsuits Against Lambert Houses Tenants Seeking Market Rent Not Owed.**

86.    The Boroff Firm files eviction lawsuits ("Eviction Lawsuits") against Class Members seeking both to evict tenants and also to obtain money judgments against them. Some of those Eviction Lawsuits are brought on behalf of Boston Tremont against Lambert Houses tenants; other Eviction Lawsuits are brought on behalf of other landlords in the Bronx ("Other Landlords").

87.    In filing and pursuing Eviction Lawsuits against Boston Tremont tenants, the Boroff Firm acts on behalf of Boston Tremont.

88.    In 2023, the Boroff Firm commenced 80 Eviction Lawsuits against Lambert Houses residents in Bronx Housing Court. In the aggregate, 144 tenants were named in those lawsuits.

89.    In each Eviction Lawsuit, the Boroff Firm prepares and files an Eviction Petition.

90.    In each Eviction Petition, an attorney from the Boroff Firm "affirm[s] under penalty of perjury" that "he has read the" petition and that the allegations in the petition are true to "his own knowledge" or "statements and/or records provided by Boston Tremont . . . contained in the file in the Attorney's office."

91.    First, the Eviction Petitions unlawfully seek to collect market rent from Class Members.

92.     Specifically, the Eviction Petitions state that "due to landlord from . . . tenant(s) . . . rent. . . as follows:" and include specified monthly amounts at market rents, as well as a total amount derived from the sum of those market rents.

93.     This statement is false. Class Members do not owe market rent. This is because Boston Tremont and Phipps do not comply with mandated recertification procedures, as required by law and Class Members' Leases, including that Boston Tremont and Phipps do not hold recertification interviews and do not send required Recertification Notices. Thus, Class Members owe only the subsidized rent provided by their Leases, not market rent.

94.     Second, each Eviction Petition filed against Class Members asserts that Class Members entered into a lease in which they promised to pay market rent.

95.     Specifically, each Eviction Petition states that the Class Member entered into "a lease . . . wherein [Class Members] promised to pay to landlord as rent" a specified monthly amount, with the amount being the market rent for the apartment.  Each Eviction Petition further states that Class Members owe the specified market rent "[p]ursuant to said lease."

96.     These statements are false. Class Members' Leases obligate them to pay a specified subsidized rent, and to only pay a market rent in the event the tenant does not recertify even though the landlord followed all HUD-required procedures. Stating that Class Members "promised to pay" a specified market rent or that market rent is owed "[p]ursuant to said lease" is false, because that promise was contingent on an event that did not occur.

97.     This statement is also false because the market rent listed in the Eviction Petitions is not an amount that Class Members agreed to pay in their Leases, or could have agreed to pay. HUD prescribes the maximum market rates that PBRA landlords can include in leases entered during a particular time period. The market rents sought in the Eviction Petitions are higher than

the HUD-allowed rates at the time Class Members entered their Leases and were not in any Lease entered by anyone. Stating that Class Members "promised to pay" a specified market rent that was not in their Leases is false.

98.    On information and belief, this statement is also false because the market rent listed in the Eviction Petitions:

a.   is greater than the rate HUD has permitted at any time period; and/or

b.   was charged earlier than allowed by HUD; and/or

c.   is greater than permitted by the 2016 regulatory agreement with the City of New York underlying the redevelopment of Lambert Houses, which limited rent increases to certain rates tied to changes in the Consumer Price Index.

99.    Third, each Eviction Petition states that the Class Member's apartment "is presently subject to the Section 8 Regulations of the Department of Housing and Urban Development (HUD) governing Substantial Rehabilitation Program [sic] and [Boston Tremont] is in compliance with the Rules and Regulations thereof."

100.    This statement is false. Boston Tremont is not in compliance with the applicable HUD rules and regulations.

101.    Fourth, the Eviction Petitions falsely state that Class Members owe the full purported monthly rent (that is, the full market rent) for each month because they do not credit any payments made by Class Members during the time period their arrears purportedly accrued, for example, payments of the subsidized rent amount for that month.

102.    As a result of failing to credit Class Members' payments, the Eviction Petitions falsely overstate the *total* amount of debt owed by Class Members, often by many thousands of dollars.

103.    The Eviction Petitions are also misleading, in that they convey to a judge that the Class Members have not made *any* payments at all for many months when, in reality, they did

continue to make rent payments, including payments earmarked for those specific months of rent.

104.    Fifth, each Eviction Petition names as respondents tenants who are not the primary tenants of the apartment (individuals sometimes called "undertenants").[4] Each Eviction Petition requests a "final judgment against respondents(s) [sic] for the rent demanded therein," and states that the total amount sought in the Petition is "due to landlord from respondent tenant(s)."

105.    These statements constitute a threat to take an action that cannot lawfully be taken as to the undertenants because no money judgment can lawfully be sought against them. *See* N.Y. R.P.A.P.L. § 702.

106.    Sixth, some Eviction Petitions seek to collect additional fees, such as air conditioner charges or refrigerator charges. Those Eviction Petitions threaten to take an action that cannot lawfully be taken because such charges cannot lawfully be sought through a lawsuit seeking eviction.

107.    Like the Eviction Petitions, the Predicate Notices are false and misleading, and threaten to take actions that cannot lawfully be taken, in that they:

- Seek to collect market rent from Class Members;

- State that Class Members "are justly indebted to Boston Tremont Housing Development Fund Corporation . . . for rent . . . as follows:" and include specified monthly amounts at market rents, as well as a total amount derived from the sum of those market rents;

- State that Class Members "are required to pay said rent . . . or surrender up the possession of said premises to the Landlord. In the event you fail to comply with the terms of this notice, the Landlord will commence legal proceedings against

---

[4] In this Complaint, the term "tenant" includes individuals who may be referred to as "undertenants"; that is, the term "tenant" includes all individuals who reside in the subject apartments, regardless of whether or not they are considered to be the primary tenant.

you to collect the aforesaid sum and/or recover possession of the demise premises";

- Fail to credit Class Members' payments and state that Class Members owe the full market rent for each month even when the tenant made a payment for that month;

- Threaten to bring a lawsuit to collect a money judgment against "undertenants" against whom it is unlawful to seek such money judgments; and

- Threaten to bring an eviction lawsuit to collect fees and charges which it is unlawful to seek in an eviction proceeding.

108.    On information and belief, Boston Tremont sues tenants to collect market rents from Lambert Houses tenants far more often than other landlords in the Bronx and other New York City PBRA landlords.

**D. Diaz and Lanzot Do Not Lawfully Serve Process and Systematically Falsify Affidavits of Service**

109.    The Boroff Firm hires Process Server Plus to serve the Predicate Notices and Eviction Petitions filed by Boston Tremont, including against Class Members and, in turn, Process Server Plus hires Diaz and Lanzot as the process servers for those Notices and Petitions.

110.    The Boroff Firm also hires Process Server Plus to serve the Predicate Notices and Eviction Petitions filed by Other Landlords against their tenants, including against Class Members, and, in turn, Process Server Plus hires Diaz and Lanzot as the process servers for those Notices and Petitions.

111.    Diaz and Lanzot do not lawfully serve Class Members with the Predicate Notices and Eviction Petitions.

112.    Diaz and Lanzot purport to effectuate service against Class Members through conspicuous service under N.Y. R.P.A.P.L. § 735(1)(a), claiming that they affix a copy of each Predicate Notice or Eviction Petition to the door of the apartment after having made one prior

attempt to effectuate service, and claiming that they also have mailed a copy of each Predicate Notice or Eviction Petition.

113.    On information and belief, Diaz and Lanzot do not make any effort to serve Class Members; instead, they prepare and swear to affidavits of service in which they falsely claim to have attempted and completed service.

114.    Diaz or Lanzot prepares one affidavit of service of the Predicate Notice and one affidavit of service of the Eviction Petition as to each Class Member. Diaz and Lanzot each sign the affidavits under penalty of perjury.

115.    Diaz and Lanzot each prepare these affidavits using a standard form template.

116.    These affidavits contain false statements.

117.    First, in affidavits of service filed against Class Members, Diaz and Lanzot each swear that they were "unable to serve" the tenants "by personal delivery."

118.    This statement is false. On information and belief, Diaz and Lanzot do not make any effort to serve Class Members personally.

119.    Second, in affidavits of service filed against Class Members, Diaz and Lanzot each swear that they were "unable to find a person of suitable age and discretion" at the time of purported conspicuous service.

120.    This statement is false. On information and belief, Diaz and Lanzot do not make any effort to find a person of suitable age and discretion to serve with the Predicate Notice or Eviction Petition.

121.    Third, in affidavits of service filed against Class Members, Diaz and Lanzot each swear that they were "unable to find a person of suitable age and discretion . . . during a prior attempt made" at a specified date and time.

122.    This statement is false. On information and belief, Diaz and Lanzot did not make any prior effort to find a person of suitable age and discretion to serve with the Predicate Notice or Eviction Petition.

123.    In affidavits of service filed against Class Members, Diaz and Lanzot each swear that they affixed to the apartment door a copy of the Predicate Notice or Eviction Petition for "each" tenant in the household.

124.    This statement is false. On information and belief, Diaz and Lanzot do not post a copy for each tenant in the household.

125.    The New York State Courts Electronic Filing system displays 200 Eviction Lawsuits filed in Bronx Housing Court between January and July 2023 by the Boroff Firm. The files for these 200 cases contain 400 affidavits of service signed by Diaz (290 affidavits) or Lanzot (110 affidavits) on behalf of Process Server Plus (the "Reviewed Affidavits").

126.    In 361 out of 400 (90%) of the Reviewed Affidavits, Diaz and Lanzot claimed to have effectuated service through conspicuous service. Of the remainder, 39 (10%) of the Reviewed Affidavits claimed to make substitute service (handing the papers to an adult in the apartment other than the tenant) and zero (0%) claimed to make personal service (handing the papers directly to the tenant).

127.    Each Reviewed Affidavit purporting to have made conspicuous service lists the time and date of a purported attempted service prior to the instance of conspicuous service. Thus, the 400 Reviewed Affidavits show a total of 761 purported instances of either attempted or completed service (comprising 361 instances of conspicuous service, 361 instances of attempts prior to conspicuous service, and 39 instances of substitute service).

128.    The Reviewed Affidavits show that out of the total 761 times Diaz or Lanzot purported to have attempted to effectuate service, there were 722 times (95%) that they purported not to be able to serve the papers by personal or substitute service despite making an effort to do so.

129.    The rates at which Diaz and Lanzot claim to have effectuated service through conspicuous service are even higher for the 57 cases brought by Boston Tremont against Lambert Houses tenants. In 110 out of 114 (96%) of the Reviewed Affidavits for cases brought by Boston Tremont, Diaz and Lanzot claimed to have effectuated service through conspicuous service. Of the remainder, 4 (4%) of the affidavits of service claimed to have made substitute service and zero (0%) claimed to make personal service.

130.    The 114 Reviewed Affidavits for cases brought by Boston Tremont show a total of 224 instances of either attempted or completed service (comprising 110 instances of conspicuous service, 110 instances of attempts prior to conspicuous service, and 4 instances of substitute service). These show that out of the total 224 times Diaz and Lanzot visited a Lambert Houses apartment to attempt service, 220 times (98%) they purported not to be able to serve the papers by personal or substitute service despite making an effort to do so.

131.    For these affidavits of service to be true, it would mean that virtually every one of the hundreds of times that Diaz and Lanzot tried to effectuate service, no one answered the door (95% of all cases, and 98% of Boston Tremont cases). This is particularly unlikely given that most Eviction Petitions list multiple tenants in each apartment, indicating that most apartments have multiple adults living there. In other words, for these affidavits of service to be true, it would mean that hundreds of adults were virtually never in their own homes.

132.    Legitimate process servers effectuate service through personal service up to half of the time—because people often answer the door at their own homes. *See, e.g.*, Decl. of Bruce Lazarus, *Sykes v. Mel S. Harris & Assocs. et al.*, No. 09 Civ. 8486(DC) (S.D.N.Y), ECF No. 103.

133.    Lawfully serving process at a residence takes significant time, often up to half an hour. To attempt or effectuate conspicuous service, the process server must walk or drive to the address; if driving, find parking and get out of their car; gather the correct papers; gain access to the apartment building; walk to and find the correct apartment; ring the doorbell or buzzer, or knock; wait a reasonable amount of time for someone to answer the door; and, if completing service, post the papers on the door; record their efforts; and leave the building.

134.    Even lawfully serving process on multiple apartments within the same building takes significant time. After completing service at one apartment, the process server must walk to and find the correct apartment for the next service, often including walking up or down stairs or waiting for and riding an elevator; ring the doorbell or buzzer, or knock; wait a reasonable amount of time for someone to answer the door; post the papers on the door; and record their efforts.

135.    Lawfully serving process in the Lambert Houses would take even longer than in other areas. The Lambert Houses contains over a dozen buildings, spanning 12 acres. The buildings have extremely large footprints, up to a full residential "superblock." The buildings have complicated layouts and experience frequent elevator outages.

136.    In many cases, the affidavits of service sworn by Diaz and Lanzot demonstrate impossibly short lengths of time between purported instances of attempted or completed service.

27

137.    The Reviewed Affidavits show 175 instances in which Diaz or Lanzot swore to have attempted or completed service three minutes or less after a different purported attempted or completed service.

138.    For example, on April 29, 2023, a Saturday, Diaz purported to attempt service at 21 Lambert Houses apartments at 5 different building addresses in just over an hour, between 6:02pm and 7:09pm. All but three of these purported attempts were three minutes or fewer before and/or after a different purported service attempt. For example, Diaz purported to attempt service at 6:11pm, 6:13pm, 6:15pm, 6:18pm, and 6:21pm. Diaz swore that he found no one home at any of these attempts.

139.    Two days later, on Monday, May 1, 2023, Diaz purported to effectuate conspicuous service at the same 21 apartments in just over an hour, between 9:16am and 10:28am. All but four of these purported services were three minutes or fewer before and/or after a different purported service. For example, Diaz purported to effectuate conspicuous service at 10:14am, 10:16am, 10:18am, 10:20am, 10:23am, 10:25am, and 10:28am. Diaz swore that he— once again—found no one home at any of these purported services.

140.    For Diaz's sworn statements to be true, it would mean not only that the times between service attempts was plausible, but also that *none* of the 44 tenants named in these 21 Eviction Petitions—and none of their friends or family—were home at their apartments *either* on Saturday evening *or* on Monday morning.

141.    As another example, on Saturday, March 18, 2023, Lanzot purported to attempt service at eight Lambert Houses apartments at two different addresses in just nineteen minutes, between 6:52pm and 7:11pm. Most of these attempts were two minutes or fewer before and/or

after a different purported service attempt. For example, Lanzot purported to attempt service at 6:52pm, 6:53pm, and 6:54pm. Lanzot swore that he found no one home at any of these attempts.

142.    Two days later, on Monday, March 20, 2023, Lanzot purported to effectuate conspicuous service at the same 8 apartments in just eighteen minutes, between 10:24am and 10:42am. All but one of these purported services were two minutes or fewer apart. For example, Lanzot purported to effectuate conspicuous service at 10:24am, 10:26am, 10:28am, 10:30am, and 10:32am. Lanzot swore that he found no one home at any of these purported services.

143.    For Lanzot's sworn statements to be true, it would mean not only that the times between service attempts was plausible, but also that *none* of the 10 tenants named in these eight Eviction Petitions—and none of their friends or family—were home at their apartments *either* on Saturday evening *or* on Monday morning.

144.    On information and belief, Diaz and Lanzot falsify affidavits of service by quickly running through apartment buildings and posting papers on the apartment doors, without making any effort to serve the papers through personal or substitute service.

145.    Alternatively, on information and belief, Diaz and Lanzot do not even attempt to post the papers at all.

146.    Multiple judges have found that Diaz and Lanzot have failed to lawfully serve tenants or consumers. For example:

- In December 2018, in *Ryer 2180 v. Cardona*, CV-015055-17/BX, Judge Lyle E. Frank Jr. of the New York City Civil Court, Bronx County found that Diaz's "process server's records do not comply with either General Business Law § 89-cc or the Rules of the City [of] New York 2-233 (b)(1)" and that "Mr. Diaz's testimony [purporting conspicuous service] was not credible."

- In April 2019, in *Shllaku Holdings v. Peralta*, CV-001419-15/BX, Judge Brenda Rivera of the New York City Civil Court, Bronx County, after reviewing Diaz's logbook entries, found that service "was not proper" and noted that Diaz purporting to serve two

individuals four minutes apart was "incredible," in addition to the affidavit of service listing the "wrong skin color and age for Defendant Peralta."

- In February 2019, in *3694 Broadway Associates, LLC v. Layens*, CV-023519-17/NY, Judge Dakota D. Ramseur of the New York City Civil Court, New York County found that Lanzot's service was improper because there were "too many inconsistencies in Lanzot's testimony" and "the markings in Lanzot's logbook are implausible."

- In February 2021, in *2437 Valentine Associates, LLC v. Valverde*, CV-004439-16/BX, Judge Fidel E. Gomez of the New York City Civil Court, Bronx County found that Lanzot's service was "improper" and noted that Lanzot purporting to serve two individuals 3 miles apart in only seven or eight minutes was "simply incredible, hard to fathom, and casts serious doubt as to whether Lanzot was testifying credibly."

147.    In a number of additional cases, state court judges have ordered evidentiary hearings after consumers made prima facie challenges to Lanzot's purported service on behalf of Process Server Plus and the Boroff Firm.

148.    Diaz, Lanzot, and Process Server Plus have all faced discipline by DCWP for violating rules regulating service of process.

149.    In 2014, Lanzot entered into a consent order with DCWP, and paid a fine, to settle charges that he violated rules governing process servers.

150.    In 2020, Diaz entered into a consent order with DCWP, and paid a fine, to settle charges that he violated rules governing process servers.

151.    In 2020, Process Server Plus entered a consent order with DCWP, and paid a fine, to settle charges that it violated rules governing process serving agencies.

152.    In March 2022, DWCP denied Emmanuel Lanzot's process server license renewal application because Lanzot violated Title 6 of the Rules of the City of New York (6 RCNY) § 2-234 by signing a false affidavit; giving false testimony in court; and engaging in "sewer service."

153.    In March 2023, New York Supreme Court denied Lanzot's petition to overturn DWCP's decision to not renew his process server license, finding that "DCWP's determination not to renew [Lanzot's] application based upon a finding that [Lanzot] signed a false affidavit,

gave false testimony in court, and engaged in 'sewer service' was amply supported by the evidence and not arbitrary or capricious." Following this decision, Lanzot is no longer permitted to serve process in New York City.

154.    Diaz and Lanzot provide all completed affidavits of service in the Eviction Lawsuits to Process Server Plus.

155.    Thomas Dundas, on behalf of Process Server Plus, notarizes all of these affidavits of service.

156.    Thomas Dundas is the principal of Process Server Plus.

157.    On information and belief, Process Server Plus reviews or should review all of these affidavits of service.

158.    Process Server Plus knows, or should know, that Diaz and Lanzot have falsely attested to service of process in these affidavits of service.

159.    The Boroff Firm files the false affidavits of service in the Eviction Lawsuits.

160.    The Boroff Firm reviews or should review all of these affidavits of service.

161.    A meaningful review of the affidavits of service would compel the conclusion that the affidavits are facially implausible because, as described above, virtually all the affidavits of service purport to make conspicuous service, and many purport to make conspicuous service in a time period that is physically impossible or implausible.

162.    On information and belief, no attorney at the Boroff Firm meaningfully reviews the affidavits of service, or, in the alternative, an attorney at the Boroff Firm does meaningfully review the affidavits of service and files them despite the affidavits being facially implausible.

163.    The Boroff Firm knows, or should know, that Diaz and Lanzot have falsely attested to service of process in these affidavits of service.

164.    Process Server Plus was aware or should have been aware of each traverse hearing ordered against Diaz or Lanzot, as Process Server Plus reported them or should have reported them to DCWP.

165.    Boston Tremont knows, or should know, that Diaz, Lanzot, and Process Server Plus have falsely attested to service of process, and the Boroff Firm has filed those false affidavits.

166.    On information and belief, because Class Members have not been lawfully served with Predicate Notices and Eviction Petitions, some Class Members do not timely learn that they are alleged to owe back rent or that Eviction Lawsuits have been filed against them.

167.    On information and belief, some Class Members become aware of the Eviction Lawsuits not through lawful service of process, but in some other way.

168.    Many Class Members do not appear in court in the Eviction Lawsuits. On information and belief, these Class Members fail to appear in court as a direct result of Defendants' sewer service. Some Class Members have default judgments entered against them.

**E.  Defendants' Actions Harm Class Members While Defendants Enrich Themselves**

169.    Defendants' actions cause serious harm to Class Members in multiple ways.

170.    First, Boston Tremont and Phipps harm Class Members by failing to allow them to recertify their housing subsidies, requiring them to spend significant time and expense attempting to recertify, failing to make reasonable HUD-mandated procedures for recertification available to them, and depriving them of the meaningful opportunity to address any purported recertification issues. These harms put Class Members at risk of eviction and displacement, of collection of rent that they do not owe, and of losing their subsidies going forward.

171.    Second, the Boroff Firm, on behalf of Boston Tremont, harms Class Members by making false statements in the Eviction Petitions regarding the rent Class Members purportedly owe, putting them at risk of eviction and displacement, and of collection of rent that they do not owe.

172.    Third, Diaz and Lanzot, on behalf of Process Server Plus and, in turn, the Boroff Firm and Boston Tremont, harm Class Members by failing to lawfully serve Class Members and by making false statements regarding service, putting them at risk of eviction and displacement, and of collection of rent that they do not owe. Diaz and Lanzot's conduct also deprives Class Members of the opportunity to address any purported rent owed or other legal issues prior to an Eviction Lawsuit being commenced, and depriving them of the opportunity to defend the Eviction Lawsuit.

173.    Fourth, Diaz and Lanzot, on behalf of Process Server Plus and, in turn, the Boroff Firm, harm Class Members by failing to lawfully serve Class Members and instead leaving all Predicate Notices and Eviction Petitions on Class Members' apartment doors. This conduct harms Class Members because it has the effect of alerting other tenants that the Class Members are behind on rent and/or face potential eviction, leading to public embarrassment and fear of losing their home.

174.    Finally, the Boroff Firm, on behalf of Boston Tremont and Other Landlords, harms Class Members by in fact evicting them, obtaining and collecting on settlements entered by some Class Members, and obtaining and collecting on money judgments against other Class Members.

175.    Some tenants against whom Boston Tremont brought eviction proceedings have had warrants of eviction issued against them.

176.    In the aggregate, Defendants' conduct has the potential to result in widespread eviction and displacement of Class Members, the majority of whom are Latinx or Black. Because New York City lacks adequate affordable housing, Defendants' conduct is likely to leave many Class Members homeless and force them into the City's overburdened shelter system.

177.    On information and belief, some Class Members who are not lawfully served never find out about the Eviction Lawsuits. Some Class Members have had default judgments entered against them. Other Class Members do appear in court but are *pro se*, so they are unable to successfully challenge unlawful amounts sought and/or unlawful service and thus are forced to pay market rent they do not owe or be evicted.

178.    Judgments entered against Class Members can lead to Class Members being deprived of their funds (temporarily or permanently) when Defendants execute on the judgments or persuade Class Members to make payments on the judgments. Judgments entered against Class Members can also affect Class Members' ability to obtain credit and make it more difficult for them to find alternative housing.

179.    Many Class Members agree to settle the Eviction Lawsuits even when they have strong defenses. For example, Class Members may agree voluntarily to move out because the proceedings are stressful and they do not have sufficient funds to pay the amounts sought. Class Members who settle the Eviction Lawsuits by agreeing to move out are effectively abandoning what may be their only meaningful access to sustainable affordable housing.

180.    Class Members who settle the Eviction Lawsuits may rely on loans to pay the settlement amount, thus burdening them with debt.

181.    Settlements entered by Class Members can lead to Class Members being deprived of their funds (temporarily or permanently) when they make payments to satisfy the settlements.

182.    Class Members who appear in court to defend the Eviction Lawsuits are harmed independent of whether the proceedings end in settlement or judgment or are dismissed. Harms to these Class Members include, but are not limited to: time and money spent to appear in court, including lost wages due to missed work, postage, photocopying, transportation, and childcare; emotional distress; and money paid out of pocket to satisfy judgments or settlement agreements.

183.    Defendants' actions also risk harming the public fisc. For example, New York City operates a program that provides grants colloquially known as "One-Shot Deals," by which certain low-income tenants who face eviction obtain public funds to pay debts owed to their landlords and restore their tenancy. In the Predicate Notices, Boston Tremont encourages tenants to secure these public funds to pay their purported debts. To the extent that Class Members obtain "One-Shot Deals" to satisfy Defendants' improper demands for market rent, public New York City tax dollars are wrongfully being paid to Defendants in an amount to which they are not entitled.

184.    Defendants' actions are ongoing and will cause further harm to Class Members absent Court intervention.

185.    Meanwhile, Defendants profit from their unlawful actions.

186.    Any payments Boston Tremont tenants make in connection with the Eviction Lawsuits go directly to Boston Tremont and, in turn, Phipps, in its role as property manager.

187.    On information and belief, Boston Tremont and Phipps further benefit from the Eviction Lawsuits by evicting tenants before Boston Tremont and Phipps are obligated to re-house those tenants during the redevelopment process and, eventually, in newly renovated apartments.

188.    The Boroff Firm benefits by being compensated by Boston Tremont and Other Landlords for filing and litigating the Eviction Lawsuits.

189.    To the extent that tenants are not properly notified of the Eviction Lawsuits and do not appear in court, the Boroff Firm further benefits because its litigation costs are limited.

190.    On information and belief, Diaz, Lanzot, and Process Server Plus are paid a flat fee for each case in which service is purportedly made.

191.    By failing to actually serve Class Members, but claiming to have done so, Diaz, Lanzot, and Process Server Plus are paid for a number of cases that exceeds the number of cases in which they could lawfully serve process, thereby increasing their own profits.

## FACTS CONCERNING NAMED PLAINTIFF

192.    Plaintiff Maritza Prince, a U.S. citizen born in the Dominican Republic, is a seventy-four year old Latina monolingual Spanish speaker. Ms. Prince resides in her apartment at the Lambert Houses with her family, including her son, granddaughter, and other relatives.

193.    Ms. Prince lives on a fixed income of Supplemental Security Income, which is available only to individuals who are elderly, disabled, or both; have very low income; and have assets of less than approximately $2,000.

194.    Ms. Prince receives a Section 8 subsidy to pay her rent.

195.    Ms. Prince has lived in her apartment for more than thirty years. During that period, she has reliably paid rent and recertified her income and household composition each year to maintain her Section 8 subsidy.

196.    Ms. Prince entered into a Lease with Boston Tremont that was substantially identical to the HUD model lease. *See supra* ¶¶ 27, 43.

197.    In approximately 2021, Ms. Prince successfully recertified and signed a Lease providing for a subsidized rent of $494 per month.

198.    In connection with the subsequent renewal of her Lease, Ms. Prince diligently attempted to recertify. But Phipps and Boston Tremont obstructed her recertification.

199.    Boston Tremont and Phipps did not offer Ms. Prince a recertification interview or allow her to make an in-person appointment about recertification at any time before they filed an Eviction Lawsuit against her. Instead, Boston Tremont and Phipps directed her to submit documentation and information through the mail or lockbox.

200.    All of the documents Boston Tremont and Phipps provided Ms. Prince about recertification were in English. Boston Tremont and Phipps also provided her Lease and Lease riders only in English.

201.    Boston Tremont and Phipps sent Ms. Prince mail regarding recertification that was confusing and asked for conflicting documents.

202.    Ms. Prince diligently attempted to comply with the requests for documents. With family members' help, she submitted dozens of documents through the mail and lockbox.

203.    Boston Tremont and Phipps did not send Ms. Prince the First, Second, and Third Reminder Notices required by HUD at any time before they filed an Eviction Lawsuit against her.

204.    Boston Tremont and Phipps first produced copies of those Notices to Ms. Prince after the Eviction Lawsuit had been filed. Those Notices lacked the content required by HUD. *See supra* ¶ 36.

205.    Since her last successful Lease renewal in 2021, Ms. Prince has continued to pay her subsidized rent of $494 each month. She specifically earmarked many of those payments as

being for the month in which each was due. Boston Tremont and Phipps have continued to accept these payments.

206.    On December 14, 2022, the Boroff Firm prepared a Predicate Notice stated that Ms. Prince and her son and granddaughter were "justly indebted to Boston Tremont Housing Development Fund Corporation . . . for rent . . . as follows:" and listed a market rent of either $2,690 or $2,614 for each month from February through December 2022 (and $1,420 for January 2022), for a total amount of $30,630. The Predicate Notice stated that Ms. Prince was required to pay that amount in thirty days or be sued in an eviction lawsuit.

207.    On April 11, 2023, the Boroff Firm filed an Eviction Lawsuit against Ms. Prince and her son and granddaughter, captioned *Boston Tremont Housing Development Fund Corporation v. Prince*, *et. al.*, No. LT-316381-23/BX in Bronx County Housing Court, seeking $36,724 in unpaid rent and a judgment of eviction.

208.    In the Eviction Petition, an attorney from The Boroff Firm "affirm[ed] under penalty of perjury" that "he has read the" Eviction Petition and that the allegations in it were true to "his own knowledge" or "statements and/or records provided by Boston Tremont] . . . and contained in the file in the Attorney's office."

209.    First, the Eviction Petition unlawfully seeks to collect market rent from Ms. Prince.

210.    Specifically, the Eviction Petition states that "due to landlord from . . . tenant(s) . . . rent. . . as follows:" and includes a specified monthly amount of $2,690, which is what Boston Tremont holds out to be the market rent for that apartment, as well as a total amount derived from the sum of those market rents.

211.    This statement is false. Ms. Prince does not owe market rent. *See supra* ¶¶ 78-83.

212.    Second, the Eviction Petition filed against Ms. Prince asserts that she entered into a Lease in which she promised to pay market rent.

213.    The Eviction Petition filed against Ms. Prince states that Ms. Prince entered into "a lease . . . wherein [Ms. Prince] promised to pay to landlord as rent $2,690.00 each month" and that "[p]ursuant to said lease" Ms. Prince owed $2,690 each month.

214.    This statement is false. Ms. Prince did not enter a lease in which she promised to pay that amount. *See supra* ¶¶ 96-98.

215.    Third, the Eviction Petition filed against Ms. Prince states that her apartment "is presently subject to the Section 8 Regulations of the Department of Housing and Urban Development (HUD) governing Substantial Rehabilitation Program [sic] and [Boston Tremont] is in compliance with the Rules and Regulations thereof."

216.    This statement is false. Boston Tremont is not in compliance with the applicable HUD rules and regulations. *See supra* ¶¶ 78-83.

217.    Fourth, the Eviction Petition falsely states that Ms. Prince owes the full purported monthly rent (that is, the full market rent) for each month because it does not credit any payments Ms. Prince made during the time period her arrears purportedly accrued. *See supra* ¶¶ 101-03.

218.    For example, the Eviction Petition falsely states that she owes "$2690.00" for "Oct 22." But Ms. Prince paid her $494 subsidized portion of the rent to Boston Tremont in October 2022, earmarking her check for that month as "Rent Oct." Thus, the maximum she could owe for this month, even if $2,690 were a lawful monthly rent, is $2,690 less her $494 payment.

219.    Fifth, the Eviction Petition names Ms. Prince's son and granddaughter as "Respondents (Undertenants)." The Eviction Petition requests a "final judgment against

respondents(s) [sic] for the rent demanded therein," in the amount of $36,724, and states that the

total amount sought in the Petition was "due to landlord from respondent tenant(s)."

220.    These statements constitute a threat to take an action that cannot lawfully be taken

as to Ms. Prince's son and granddaughter because no money judgment can lawfully be sought

against them. *See supra* ¶ 105.

221.    The Predicate Notice filed as part of the Eviction Lawsuit against Ms. Prince is

likewise false and misleading, in that it:

- Seeks to collect market rent from Ms. Prince;

- States that Ms. Prince is "justly indebted to Boston Tremont Housing
  Development Fund Corporation . . . for rent . . . as follows:" and include specified
  monthly amounts at market rents, as well as a total amount derived from the sum
  of those market rents;

- States that Ms. Prince is "required to pay said rent . . . or surrender up the
  possession of said premises to the Landlord. In the event you fail to comply with
  the terms of this notice, the Landlord will commence legal proceedings against
  you to collect the aforesaid sum and/or recover possession of the demise
  premises.";

- Falsely states that Ms. Prince owes the full market rent for each month because it
  fails to credit Ms. Prince's payments for that month; and

- Threatens to bring a lawsuit to collect a money judgment against Ms. Prince's son
  and granddaughter, against whom it is unlawful to seek such money judgments.

222.    In an affidavit of service that the Boroff Firm filed with the Eviction Petition,

Enrique Diaz swore that he served Ms. Prince, her son, and her granddaughter with the Predicate

Notice on January 17, 2023 at 10:11a.m., by affixing a copy of the Predicate Notice to her door

and mailing the Predicate Notice to the same address; that he had previously attempted to serve

them with the Predicate Notice on January 14, 2023 at 6:37p.m; that he was "unable to serve"

Ms. Prince or her son or granddaughter by personal delivery on either occasion; and that he was

"unable to find a person of suitable age and discretion on either occasion.

223.    In an affidavit of service that the Boroff Firm filed with the Eviction Petition, Enrique Diaz swore that he served Ms. Prince, her son, and her granddaughter with the Eviction Petition on May 16, 2023 at 10:09a.m., by affixing a copy of the Eviction Petition to her door and mailing it to the same address; that he had previously attempted to serve them with the Eviction Petition on May 15, 2023 at 6:41p.m; that he was "unable to serve" Ms. Prince or her son or granddaughter by personal delivery on either occasion; and that he was "unable to find a person of suitable age and discretion" on either occasion.

224.    These statements in both affidavits were false. Ms. Prince and/or one of her relatives are regularly at home at each of the days and times listed in the affidavits of service, and one of them would have been home at least one of those days and times. No one knocked or rang her doorbell at any of those times. Neither the Predicate Notice nor the Eviction Petition were left on Ms. Prince's door at any time.

225.    On information and belief, Diaz did not make any effort to serve Ms. Prince or her family members with the Predicate Notice or Eviction Petition either personally or by finding a person of suitable age and discretion.

226.    Because she was not lawfully served with the Eviction Petition, Ms. Prince did not initially know that the Eviction Lawsuit had been filed against her.

227.    Ms. Prince, her son and her granddaughter eventually each received a copy of the Eviction Petition through the mail.

228.    On May 24, 2023, Ms. Prince traveled to Bronx Housing Court to file a *pro se* Answer. Because she is a monolingual Spanish speaker, she brought her daughter to aid in translation, as well as her son and granddaughter who were named in the Eviction Petition. A Bronx Housing Court clerk provided Ms. Prince an answer form that stated a "general denial" of

the allegations, and directed Ms. Prince to sign it. Ms. Prince and her daughter said they wanted to check additional boxes, including the box challenging service of the Predicate Notice and Eviction Petition, but the clerk said that they were not allowed to do so.

229.    Ms. Prince subsequently retained the New York Legal Assistance Group ("NYLAG"), a nonprofit legal services organization that provides free legal services to individuals with low incomes, to represent her in the Eviction Lawsuit.

230.    On August 31, 2023, Ms. Prince, through her attorney, moved to dismiss the Eviction Lawsuit, on the basis that, among other things, Ms. Prince was not lawfully served; that Boston Tremont had not credited any of her payments; and that Boston Tremont unlawfully sought to collect market rent. Ms. Prince filed copies of the checks showing that she had paid $494 in rent every month.

231.    The Boroff Firm, on behalf of Boston Tremont, opposed Ms. Prince's motion, falsely describing Ms. Prince's claims that she was not served as "spurious," "self-serving," and "conclusory"; falsely stating that it was Ms. Prince who "did not finish submitting the required documentation" for recertification; and falsely stating that Boston Tremont "provided [Ms. Prince] with a proper initial notice" and reminder notices pursuant to HUD guidelines.

232.    Ms. Prince and her attorney appeared in court to defend the Eviction Lawsuit on September 5, 2023, October 24, 2023, December 6, 2023, and January 12, 2024. On February 23, 2024, Ms. Prince was ill, so her attorney appeared in court on her behalf. A sixth court date is scheduled for April 24, 2024.

233.    Defendants' actions have caused harm to Ms. Prince. Ms. Prince spent time and money to appear at multiple court dates and meet with her attorney, including but not limited to money for postage, notarization, transportation, and photocopying. Defendants' actions also

caused Ms. Prince to experience emotional distress, including considerable stress and anxiety over the prospects that she and her family would lose their long-term home and would not have access to other affordable housing. This stress and anxiety has had negative effects on her health, including decreased appetite and weight loss.

## CLASS ACTION ALLEGATIONS

234.    Plaintiff brings this action, pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and as representative of a Class consisting of:

> All individuals who have been or will be sued by the Boroff Firm in New York City Housing Court- Bronx County in lawsuits in which (a) Boston Tremont is the plaintiff and/or (b) an affidavit of service has been or will be filed, stating that Diaz or Lanzot, on behalf of Process Server Plus, effectuated service of an eviction petition via conspicuous service.

235.    The "Boston Tremont Subclass" consists of:

> All individuals who have been or will be sued by the Boroff Firm in New York City Housing Court- Bronx County in lawsuits in which Boston Tremont is the plaintiff.

236.    The "Conspicuous Service Subclass" consists of:

> All individuals who have been or will be sued by the Boroff Firm in New York City Housing Court- Bronx County in lawsuits in which an affidavit of service has been or will be filed, stating that Diaz or Lanzot, on behalf of Process Server Plus, effectuated service of an eviction petition via conspicuous service.

237.    The Class as a whole, and each Subclass, is so numerous that joinder of all Class Members in this action would be impracticable.

238.    There are at least 144 members of the Boston Tremont Subclass and 330 members of the Conspicuous Service Subclass. Many Class Members are members of both Subclasses.

239.    The precise number and identity of Class Members and Subclass Members is contained within Defendants' business and litigation records.

240.    Defendants have acted and continue to act in a similar manner toward each member of the Class and each Subclass, thereby making appropriate final declaratory and injunctive relief with respect to the Class and each Subclass as a whole.

241.    Class Members and Subclass Members present common questions of law and fact and these questions predominate over any individual questions.

242.    The common questions of fact include, but are not limited to, whether Defendants fail to allow tenants to recertify their income; whether Defendants prepare and file Eviction Petitions that contain false statements regarding income certification and false affidavits of service; and what review, if any, Process Server Plus, the Boroff Firm, and Boston Tremont perform of the relevant documents.

243.    The common questions of law include, but are not limited to: whether Defendants' statements are false or misleading; whether the Boroff Firm conducts meaningful review; whether Defendants seek market rent from Class Members in a manner that is consistent with the Leases and HUD mandates; and whether Defendants' collection practices are unfair, deceptive, or misleading in violation of the FDCPA and New York G.B.L. § 349.

244.    Plaintiff's claims are typical of the claims of the Class and of each Subclass. Defendants act in the same manner toward Plaintiff and the Class and Subclasses as a whole, including by preparing and filing Eviction Petitions that include the same false and misleading statements.

245.    Plaintiff will adequately and fairly protect the interests of all members of the proposed Class because she has the requisite personal interest in the outcome of this litigation and has no interest antagonistic to any member of the proposed Class.

44

246.    Plaintiff is represented by NYLAG. Attorneys at NYLAG are experienced in complex federal litigation, class action litigation, and consumer and eviction defense litigation.

247.    The common questions of law and fact predominate in this action.

248.    A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted and continue to act in the same manner toward the Class and each Subclass as a whole and a class action will avoid numerous separate actions by Class Members that would unduly burden the courts and create the possibility of inconsistent decisions.

249.    Moreover, it would be impracticable for Class Members, who are low-income individuals, to obtain legal counsel on an individual basis to bring claims of the type raised in this action. Hence their rights may well be meaningless without certification of a class action seeking common redress.

250.    Final injunctive and declaratory relief and money damages are appropriate as to the Class and each Subclass as a whole.

**FIRST CAUSE OF ACTION**
Violation of the FDCPA, 15 U.S.C. §§ 1692e, 1692f
Against The Boroff Firm
On behalf of Plaintiff and the Boston Tremont Subclass

251.    The FDCPA, 15 U.S.C. § 1692e, prohibits a debt collector from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt."

252.    The FDCPA, 15 U.S.C. § 1692f, prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."

253.    The Boroff Firm violates the FDCPA, §§ 1692e and 1692f, by making false, deceptive, and misleading representations and engaging in unfair and unconscionable practices, including, but not limited to:

a.  Seeking to collect debt not owed;

b.  Preparing, signing, and filing Eviction Petitions that contain false or misleading statements;

c.  Preparing, signing, and filing Eviction Petitions that threaten to take action that cannot legally be taken;

d.  Preparing, signing, and filing Eviction Petitions without meaningful attorney review; and

e.  Preparing, signing, and filing Eviction Petitions when required communications have not been provided in Spanish to persons of limited English proficiency.

254.    Defendant's wrongful and deceptive acts have caused and continue to cause injury and damages to Plaintiff and putative Class Members and, unless enjoined, will cause further injury.

255.    As a direct and proximate result of Defendant's violations, Class Members have suffered and continue to suffer compensable harm and are entitled to recover actual and statutory damages, costs, and attorneys' fees.

## SECOND CAUSE OF ACTION
Violation of N.Y. Gen. Bus. § 349
Against Boston Tremont, Phipps, and The Boroff Firm
On Behalf of Plaintiff and the Boston Tremont Subclass

256.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business . . . in this state" and provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name" for injunctive relief, damages, and attorneys' fees.

257.    Defendants violate N.Y. Gen. Bus. § 349 by engaging in deceptive acts and practices in the conduct of their business, including, but not limited to:

a.  Seeking to collect debt not owed;

b.  Preparing, signing, and filing Predicate Notices and Eviction Petitions that contain false or misleading statements;

c. Preparing, signing, and filing Predicate Notices and Eviction Petitions that threaten to take action that cannot legally be taken;

d. Preparing, signing, and filing Predicate Notices and Eviction Petitions without meaningful attorney review; and

e. Preparing, signing, and filing Eviction Petitions when required communications have not been provided in Spanish to persons of limited English proficiency.

258.    Defendants' actions are consumer oriented and have had a broad impact on New York consumers at large.

259.    Defendants commit the above-described acts willfully and/or knowingly.

260.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and Class Members and, unless enjoined, will cause further injury.

261.    As a direct and proximate result of Defendants' violations, Plaintiff and Class Members have suffered and continue to suffer compensable harm and are entitled to recover actual and treble damages, costs, and attorneys' fees.

### THIRD CAUSE OF ACTION
Common Law Negligence
Against Defendants Boston Tremont, Phipps, and The Boroff Firm
On Behalf of Plaintiff and the Boston Tremont Subclass

262.    Defendant Boston Tremont, as a landlord, and Phipps, as a management company, owe a duty of reasonable care to tenants, including Plaintiff and Class Members, in collecting their rents.

263.    Defendant The Boroff Firm, as a debt collector, owes a duty of reasonable care to alleged debtors, including Plaintiff and Class Members, in collecting their debts.

264.    Defendants Boston Tremont, Phipps, and The Boroff Firm breach this duty of care by engaging in negligent acts, including, without limitation, the following:

a. Seeking to collect debt not owed;

b.  Preparing, signing, and filing Predicate Notices and Eviction Petitions that contain false or misleading statements;

c.  Preparing, signing, and filing Predicate Notices and Eviction Petitions that threaten to take action that cannot legally be taken; and

d.  Preparing, signing, and filing Predicate Notices and Eviction Petitions without meaningful attorney review; and

e.  Preparing, signing, and filing Eviction Petitions when required communications have not been provided in Spanish to persons of limited English proficiency.

265.    Defendants Boston Tremont, Phipps, and The Boroff Firm owe duties of care to Plaintiff and Class Members set forth by statute, regulation, and contract, including but not limited to the following:

a.  HUD statutes, regulations, and policies, including 42 U.S.C. § 1437f(o)(13), 24 C.F.R. § 5.657(b);

b.  Fair Debt Collection laws, including 15 U.S.C. §§ 1692d, 1692e, 1692f;

c.  Unfair and Deceptive Trade Practices laws, including N.Y. G.B.L. § 349; and

d.  Class Members' Leases.

266.    Defendants Boston Tremont, Phipps, and The Boroff Firm breached these duties of care.

267.    The purpose of each of these statutes and regulations is to protect a certain class of persons, namely alleged consumer debtors and/or tenants, of which Plaintiff and all Class Members are members.

268.    As a direct and proximate result of the negligent conduct of Boston Tremont, Phipps, and the Boroff Firm, Plaintiff and Class Members have suffered and continue to suffer compensable harm and are entitled to recover actual damages.

## FOURTH CAUSE OF ACTION
Breach of Contract
Against Defendant Boston Tremont
On Behalf of Plaintiff and the Boston Tremont Subclass

269.    Defendant Boston Tremont is in material breach of the Leases it entered into with Plaintiff and Class Members.

270.    Specifically, the Leases state that Boston Tremont may require Class Members to "pay the higher, HUD-approved market rent for the unit" "only in accordance with the administrative procedures and time frames specified in HUD's regulations, handbooks and instructions related to the administration of multifamily subsidy programs," Lease ¶ 15(a), and that "[t]he Landlord agrees to implement changes in the Tenant's rent or tenant assistance payment only in accordance with the time frames and administrative procedures set forth in HUD's handbooks, instructions and regulations related to administration of multifamily subsidy programs," *id.* ¶ 4.

271.    Boston Tremont breached the Leases by charging market rent, notwithstanding that it failed to follow HUD handbooks, instructions and regulations related to administration of multifamily subsidy programs.

272.    Contracts impose upon each party a duty of good faith and fair dealing. Boston Tremont breached its duty of good faith and fair dealing by failing to take reasonable steps to preserve the Section 8 subsidy of its low-income tenants and systematically seeking to evict and displace them. In doing so, Boston Tremont has undermined the purpose of the federally-subsidized housing program that HUD has charged it with administering for the benefit of the low-income tenants who receive the subsidy.

273.    Plaintiffs have substantially performed their obligations under the Leases.

274.     Defendant's breach of the Leases has caused and continues to cause injury and damages to Plaintiff and Class Members and, unless enjoined, will cause further injury.

275.     Plaintiff and Class Members have no adequate remedy at law to stop future breaches and specific performance will not impose a disproportionate or inequitable burden on Boston Tremont.

276.     As a direct and proximate result of Defendant's violations, Plaintiff and Class Members have suffered and continue to suffer compensable harm and are entitled to recover actual damages.

**FIFTH CAUSE OF ACTION**
Violation of the FDCPA, 15 U.S.C. §§ 1692d, 1692e, 1692f
Against The Boroff Firm, Process Server Plus, Diaz, and Lanzot
On behalf of Plaintiff and the Conspicuous Service Subclass

277.     The FDCPA, 15 U.S.C. § 1692d, prohibits a debt collector from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt," including the "publication of a list of consumers who allegedly refuse to pay debts."

278.     The FDCPA, 15 U.S.C. § 1692e, prohibits a debt collector from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt."

279.     The FDCPA, 15 U.S.C. § 1692f, prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."

280.     Defendants violate the FDCPA, §§ 1692d, 1692e, and 1692f, by making false, deceptive, and misleading representations and engaging in harassing and abusive, and unfair and unconscionable practices including, but not limited to:

a.   Failing to lawfully effectuate service of process;

b.   Preparing and signing false affidavits of service;

c.  Filing false affidavits of service;

d.  Filing affidavits of service without meaningful attorney review; and

e.  Posting Eviction Petitions on apartment doors under circumstances not permitted by law, thereby publicly identifying tenants who allegedly refuse to pay debt.

281.    Defendants' wrongful and deceptive acts have caused and continue to cause injury and damages to Plaintiff and Class Members and, unless enjoined, will cause further injury.

282.    As a direct and proximate result of Defendants' violations, Plaintiff and Class Members have suffered and continue to suffer compensable harm and are entitled to recover actual and statutory damages, costs, and attorneys' fees.

### SIXTH CAUSE OF ACTION
Violation of N.Y. Gen. Bus. § 349
Against Boston Tremont, The Boroff Firm, Process Server Plus, Diaz, and Lanzot
On behalf of Plaintiff and the Conspicuous Service Subclass

283.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business . . . in this state" and provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name" for injunctive relief, damages, and attorneys' fees.

284.    Defendants violate N.Y. Gen. Bus. § 349 by engaging in deceptive acts and practices in the conduct of their business. Defendants' violations include, but are not limited to:

a.  Failing to lawfully effectuate service of process;

b.  Preparing and signing false affidavits of service;

c.  Filing false affidavits of service;

d.  Filing affidavits of service without meaningful attorney review; and

e.  Posting Eviction Petitions on apartment doors under circumstances not permitted by law, effectively publicly identifying tenants who allegedly refuse to pay debt.

285.    Defendants' actions are consumer oriented and have had a broad impact on New York consumers at large.

286.    Defendants commit the above-described acts willfully and/or knowingly.

287.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and Class Members and, unless enjoined, will cause further injury.

288.    As a direct and proximate result of Defendants' violations, Plaintiff and Class Members have suffered and continue to suffer compensable harm and are entitled to recover actual and treble damages, costs, and attorneys' fees.

## SEVENTH CAUSE OF ACTION
Common Law Negligence
Against Boston Tremont, The Boroff Firm, Process Server Plus, Diaz, and Lanzot
On Behalf of Plaintiff and the Conspicuous Service Subclass

289.    Defendants Boston Tremont, The Boroff Firm, Process Server Plus, Diaz, and Lanzot, as debt collectors, owe a duty of reasonable care to alleged debtors, including Named Plaintiff and Class Members, in collecting their debts.

290.    Defendants Boston Tremont, The Boroff Firm, Process Server Plus, Diaz, and Lanzot breach this duty of care by doing, without limitation, the following:

a.  Failing to lawfully effectuate service of process;

b.  Preparing and signing false affidavits of service;

c.  Filing false affidavits of service;

d.  Filing affidavits of service without meaningful attorney review; and

e.  Posting Eviction Petitions on apartment doors under circumstances not permitted by law, effectively publicly identifying tenants who allegedly refuse to pay debt.

291.    Defendants Boston Tremont, The Boroff Firm, and Process Server Plus each owe a duty to Plaintiff and Class Members to exercise reasonable care to refrain from knowingly

employing or retaining in their employ, any person in a position that would present foreseeable risk of harm to Plaintiff and Class Members.

292.    Defendants breach this duty of reasonable care by continuing to employ and retain, in turn, Defendants The Boroff Firm, Process Server Plus, and Diaz and Lanzot, despite the fact that they know or, in the exercise of reasonable care, should know that Class Members are not being served and false affidavits of service are being sworn and filed, which presents a foreseeable risk of harm to Plaintiff and Class Members.

293.    Defendants The Boroff Firm, Process Server Plus, Diaz, and Lanzot owe duties of care to Plaintiff and Class Members set forth by statute and regulation, including but not limited to the following:

a.    Fair Debt Collection laws, including 15 U.S.C. §§ 1692d, 1692e, 1692f;

b.    Unfair and Deceptive Trade Practices laws, including N.Y. G.B.L. § 349; and

c.    Laws and Rules governing service of process, including N.Y.C. Admin. Code § 20-409.2.

294.    Defendants The Boroff Firm, Process Server Plus, Diaz, and Lanzot breached these duties of care.

295.    The legislative purpose of each of these statutes and regulations is to protect a certain class of persons, namely alleged consumer debtors and/or tenants, of which Plaintiff and all Class Members are members.

296.    As a direct and proximate result of the negligent conduct of Boston Tremont, the Boroff Firm, Process Server Plus, Diaz, and Lanzot, Plaintiff and Class Members have suffered and continue to suffer compensable harm and are entitled to recover actual damages.

## EIGHTH CAUSE OF ACTION

Violation of N.Y.C. Admin. Code § 20-409.2
Against Defendants Process Server Plus, Diaz, and Lanzot
On behalf of Plaintiff and the Conspicuous Service Subclass

297.    New York City Administrative Code § 20-409.2 states that "[a]ny person injured by the failure of a process server to act in accordance with the laws and rules governing service of process in New York state, including this subchapter and regulations promulgated thereunder, shall have a cause of action against such process server and process serving agency, which distributed or assigned process for service, in any court of competent jurisdiction."

298.    New York City Administrative Code § 20-409.2 allows individuals to recover compensatory damages, punitive damages (for willful failure to service process), injunctive and declaratory relief, costs, and attorneys' fees.

299.    Defendants Process Server Plus, Diaz, and Lanzot have violated New York City Administrative Code § 20-409.2 by failing to act in accordance with the laws and rules governing service of process in New York. Defendants' violations include, but are not limited to:

   a.   Failing to lawfully effectuate service of process;

   b.   Preparing and signing false affidavits of service;

   c.   Filing false affidavits of service;

   d.   Filing affidavits of service without meaningful attorney review; and

   e.   Posting Eviction Petitions on apartment doors under circumstances not permitted by law, effectively publicly identifying tenants who allegedly refuse to pay debt.

300.    Defendants have committed the above-described acts willfully.

301.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and Class Members and, unless enjoined, will cause further injury.

302.    As a direct and proximate result of these violations of New York City Administrative Code § 20-409.2, Plaintiff and Class Members have suffered and continue to

suffer compensable harm and are entitled to recover compensatory and punitive damages, costs, and attorneys' fees.

WHEREFORE, Plaintiff requests that this Court enter judgment against all Defendants:

a. Certifying this case as a class action, pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with a Class defined as:

All individuals who have been or will be sued by the Boroff Firm in New York City Housing Court- Bronx County in lawsuits in which (a) Boston Tremont is the plaintiff and/or (b) an affidavit of service has been or will be filed, stating that Diaz or Lanzot, on behalf of Process Server Plus, effectuated service of an eviction petition via conspicuous service.

b. Declaring that Defendants have committed the violations of law alleged in this action;

c. Enjoining and directing all Defendants to cease engaging in practices that violate the FDCPA, New York G.B.L. § 349, and N.Y.C. Admin. Code § 20-409.2 or constitute common law negligence;

d. Enjoining and directing Defendant Boston Tremont to cease violating the terms of Plaintiff and Class Members' Leases, and to specifically perform their obligations to Plaintiff and Class Members under the Leases;

e. Awarding to Plaintiff and the Class:

    i. actual and/or compensatory damages against all Defendants in amounts to be proven at trial;

    ii. statutory damages pursuant to the FDCPA;

    iii. treble damages pursuant to N.Y. G.B.L. § 349(h);

    iv. punitive damages pursuant to N.Y.C. Admin Code § 20-409.2;

    v. costs and attorneys' fees pursuant to the FDCPA, N.Y. G.B.L. § 349, and N.Y.C. Admin Code § 20-409.2; and

f. Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable by a jury.

Dated:  April 10, 2024
New York, New York


Respectfully submitted,

                                      Lisa Rivera, Esq.
                                        New York Legal Assistance Group
                                        100 Pearl Street
                                        New York, NY 10004
                                        (212) 613-5000

                                        By:

                                        Danielle Tarantolo, of counsel
                                        Jessica Ranucci, of counsel
                                        Genesis Miranda, of counsel
                                        James Tourangeau, of counsel
                                        (212) 613-6551
                                        dtarantolo@nylag.org

                                        *Counsel for Plaintiff*